Good morning, Your Honors. May it please the Court, my name is Peggy Sue Juergens and I represent the appellant Mejia Brigido-Pimental. And for purposes of this argument this morning, I'll refer to him as Brigido. I do not need to save any time for rebuttal. And I've set forth the facts in detail in my reply and in my opening brief, so with the Court's permission, I'll go directly to my arguments. Brigido's 156-month sentence here is based on clearly erroneous facts. It's also handed down in contravention of the law. I'm going to start, first of all, with the safety valve proffer that we're looking at here. The Court, Your Honors, misapplied the law when it refused to accept the safety valve proffer of Brigido. 3553F-5 was the only safety valve element even in question at sentencing. And my client did exactly what the statute said he needs to do. He gave a complete and truthful statement. When did he give it? I mean, the question is, in my mind, SHREFSA defines good faith, but it doesn't define the parameters. And if the rule is that at the very last minute, for instance, I wonder what the effect he proffered his truthful statement after his uncle's plea to a lesser charge. And the uncle got 30 months when he could well have gotten 240. Had there been any – had that information been revealed before his trial? Your Honor, those are two very good questions, I think, right there in your question. And first of all, the sentencing statute says prior to sentencing, here we're on the third sentencing, he offered his truthful – it doesn't say what he did before. SHREFSA doesn't talk about the fact that maybe he didn't say it truthfully before. We're looking at right before his third sentencing, he offered to the government to give a truthful proffer. The government refused, so not to be upstood by – at sentencing, we wrote that down on paper for the government so the court could have a look at it. And, Your Honor, this innuendo or discussion that somehow my client contributed to the 30-month sentence that the uncle got here is clearly erroneous, as I've put in my reply brief. When you follow the facts from the timeline, when my client – after his initial sentencing, when he was in prison awaiting his first appeal, Sheryl Gordon McCloud represented him. At that time, the Uncle Cristino's case was openly being prosecuted by the government. It was over a two-year period. At that time, my client made several offers to the government to talk to them about this particular case, and that would include information about the uncle. The government refused, said they did not want to talk to my client. And the problem is – and so that ultimately, he didn't even have a chance at the time when it might have affected Cristino's sentencing. Could you refer me to the record where he made a proffer before the uncle was convicted? What we have, Your Honor, is at the second sentencing hearing in front of Judge Tanner when Sheryl Gordon McCloud represented him. It's in my excerpts of record, page 5. We have Ms. McCloud stating on the record – again, this issue came up at that sentencing. And the government said, oh, Ms. Burrito has never talked to us, and we're not interested in talking to him. Ms. McCloud put on the record very specifically that my client had made several attempts to speak with the government and make a proffer. The government said, I'm not interested. And Ms. McCloud put on the record that it was in relationship to this particular case. So if he had been given the chance to make that proffer, he could have made the proffer at the time. So it's in excerpts of record, page 5, Your Honor. Thank you. Was the district court concerned about the timing issue? The district court – the timing meaning right before the third sentencing? Yes. They were concerned about the timing, but there was this innuendo that somehow my client controlled the timing and had done something wrong. Well, does that get to the – And it was deceptive. Does that suggest that the district court had a sort of a broader understanding of what good faith meant in this context? The statute doesn't refer to – the statute doesn't say good faith. Correct. But we've suggested that there needs to be, you know, sort of good faith performance. And I'm wondering if the district court – how the district court was interpreting it. Well, Your Honor, that is the crux, and that's a great question, because the good faith got all sideways at sentencing and somehow saying that it wasn't in good faith because he'd been deceptive somehow in not offering up to the government what he knew. But in fact, when we go back to the record of the second sentencing, it's very clearly stated that my client was trying to give the information. The government decided we don't want to talk to you, don't want to have anything to do with you. And then at that third sentencing last year about this time, the court was saying, oh, it was at the hand of my client. It had manipulated the system. And in fact, that – I submit that's not correct, and we have a record that shows that it wasn't his deceptiveness that had happened. What would be wrong with recognizing that good faith has a broader meaning, sort of like general cooperation in this determination of whether the defendant fully disclosed all his knowledge about his involvement with this? Well, Your Honor, at least looking at the Shrestha case and trying to flush that question out, it looks like this court has already talked about the fact that the purpose of the safety valve is talking about trying to give relief from the mandatory minimum for a person that has zero criminal history reports, wasn't a leader as was found here, and specifically a person in my client's position. It doesn't say that it has to reward the defendant for giving information as in a 5K situation. It also said it doesn't have to make it an easier burden on the trial court, I mean on the government, for going forward with the case as in an acceptance of responsibility case. This is set aside basically saying that prior to sentencing, and that's all the statute says. That amounts to good faith? No. If he does it any time prior to sentencing, that's the same as in good faith? That's my understanding, Your Honor, because what's undergirding that, the Shrestha case. The Shrestha case requires good faith, but it doesn't define the parameters of good faith. The Shrestha case borrowed the good faith language from the Seventh Circuit case of Arrington. If you have a look at Arrington, what was going on in Arrington in the Seventh Circuit that they decided wasn't good faith was the defendant refused to give anything more than just the facts in that plea agreement. He just said, nope, not talking. He wouldn't answer the government's further question. Correct, in Arrington. And we have the opposite here. We have a client, as the record shows, that he was offering to talk to the government, and the government would say, no, we don't hear you, and we don't want to listen to you. So we have the good faith that's defined in the Arrington case was imported into this case by the district court, and the factual setting is completely the opposite here. We have a client that is trying to talk to the government, as the record shows. Let's suppose for a minute that the district court erred in its application, its determination not to apply the safety bound. You know, he got a sentence over the mandatory minimum. What difference does it make? Well, that's a good point, Your Honor, because it's our point that this whole clearly erroneous facts, the two of them in this case, about what my client did and when he was available to talk to the government, the government didn't want to talk to him, permeated the whole record here. And it makes it an unreasonable sentence from the beginning. And it makes it an unreasonable sentence because the court said, well, even if I thought he should have gotten the safety valve, I wouldn't depart below the 120. Well, there is a huge difference between 120 and 158, first of all. And also this whole idea that somehow my client was deceptive and manipulative of the system is what drove the whole sentencing. And these two clearly erroneous facts that I set out in my reply brief drove the whole sentencing. Well, let me ask you this. Why couldn't the district court in fashioning, you know, in exercise – once he gets – let's say the district court said, okay, you get full disclosure, you may have done the third sentencing, but that timing doesn't seem to be a problem, so full disclosure here, did it by his letter, fine. Safety valve doesn't apply. So now we're in the guideline range, the advisory guidelines, looking at the 3553A factors. Why couldn't the district court say, well, you know, now looking at all of this, you know, I think there was a little bit of manipulation going on here. And, you know, in exercising my discretion, I'm going to take that into account. Why can't the district – why couldn't the district court do that? Your Honor, partly because it wouldn't follow the facts here. And to be honest with you, the district court didn't have this information about what happened at that second sentencing hearing in front of Judge Tanner, that my client – and I – it wasn't brought out at the sentencing. I didn't represent him. I have searched the record to try to show that this was – this was not my client's fault, and I have the record to show it. So the court made this manipulative finding not based on the facts here. Well, I'm just – well, I'm just – assume that. I mean, why couldn't the district court judge do that? Because I don't believe the defendant's manipulation of the system, that has anything to do with whether – with what sentence he gets. He's followed along, according to the law, what he's supposed to be doing here. And he's offering to give his information. And it gets tied up with somehow he had an effect on this uncle's sentence and what all went on in here. How can you say that the district court determined whether or not the defendant has accepted responsibility for his crime? Excuse me, Your Honor? Acceptance of responsibility. Was not an issue at the district court level. Well, I mean, you know, all that is – all the guidelines there are just advisory. Correct. Just one of the considerations the district court must take into account. And – So the district court there is sentencing, and, you know, under 3553A, it looks at the facts and circumstances of the crime, the defendant's background and whatnot. So I'm just asking you why, in all of this – in all of the data, information the district court considers in fashioning an appropriate sentence, why couldn't – once you're out of the mandatory minimum, why couldn't the district court consider this as part of the total package? I guess you could consider it, but what I'm saying is that it's not correct. And I think that's where we have to back up. Okay. And say that the facts on which the court premised its whole sentencing decision were clearly erroneous. Thank you so much. Thank you. May it please the court. I'm Douglas Hill. I'm the special assistant United States attorney for the Western District of Washington. I was the attorney for the government at almost every phase of this case except for the first couple of weeks. I was there for trial. I've been there for all the appeals, and I'm here again today. And it's a marathon. But – Let me answer a preliminary question related to what hosting counsel just said. At the second sentencing hearing, did the government decline to talk to the defendant? Which sentencing hearing? When she attempted to make a proffer? Which sentencing hearing? Well, the one she referred to. It's yes for one, it's no for another. Beg your pardon? It's yes for one, it's no for another. At the time of the second sentencing in front of Judge Tanner, there was never an offer by the defendant to talk to us about his uncle. It did not exist. She referred to excerpt of record. Unfortunately, page 5, I don't have it with me. I have it with me. And at page 5, this is the defendant's supplemental excerpt of record. Ms. McLeod, and I do not understand why, did make a statement to the court that the defendant had offered to talk to the government. The government stood up and said what he offered us was some marijuana smugglers coming into Arizona from Arizona. And we said no to that. We're not interested in that. We're not going there. Why she said he offered to talk about this case, I don't even know, because it wasn't an issue. It wasn't on the table. That's why Judge Tanner didn't need to address it. The safety valve was not on the table at the time. So she didn't make that statement. That's why I heard you say it. It wasn't a surprise to me. It had nothing to do with the uncle's case. It had nothing to do with anything at that point in time. Thank you. So we didn't bother to address it. We didn't ask for a fact-finding hearing. It was totally irrelevant to what was going on. Let me ask you this. At no point from the beginning of this case until the time he was first sentenced, let's start with that. He never offered to sit down with a proffer. He gave us a proffer, and he lied in that proffer. He had pled guilty to several of the counts. We struck a plea bargain. He pled guilty to several counts. He gave us a proffer. He lied in the proffer. We called him on it at sentencing. He moved to withdraw his guilty plea and went forward to trial and was convicted on all 11 counts. And then it gets reversed and gets set back down for a new. Well, only the sentencing. All convictions were sustained. But the sentence gets reversed. Because Judge Tanner had failed to make findings on the leadership issue. So it comes back down. We do the new sentencing. Judge Tanner essentially, the only thing he changes is he makes the findings for leadership. It goes up on appeal. And then it only comes down because of an ammaline review. Had it gone back to Judge Tanner, safety valve wouldn't have even been on the table. Only because of Judge Tanner's illness and then shortly thereafter his death, this case was assigned to Judge Layton. And because it's assigned to a brand-new judge, everything's back out on the table. And boom, suddenly for the first time at a sentencing, safety valve comes out on the table. But then he gets a completely brand-new, he gets a completely new sentence. And everybody agreed to that. And that's the only reason. Everybody agreed to that at the sentencing hearing. And that's correct under our law as well. We agreed to that. And that's what the law says. And that's what we did. Now, I think Judge Layton got it right. There's a very unique set of facts in this case that I've never seen before, I've never heard of before, I haven't seen it in any appellate cases. But you have the plea, lying at the proffer, withdrawing the plea, going to trial. He gets sentenced twice, never raises the safety valve. It's only five years later after conviction that he says, here's my safety valve proffer. I want to talk to you. And we said no. And I think for very good reasons. And we wrote that out in a letter. We submitted that with the briefing. Why wouldn't you talk to him? Well, for one thing, we believed that he had intentionally withheld from us very valuable information as to the uncle, until it was simply too late. He protected his uncle. So the information would not have been useful to you? Not at that point in time. We knew it was not useful. That's not a factor under 5K. I mean under the safety valve. It would have been under 5K. But there was no, we were going to get no benefit from it. That's not the criterion. That's right. That's not the criterion. Okay. So what next? He had lied to us in his first proffer. Okay. He had. But we know that the test is. It seems there was a third reason. I'm not remembering. We know that the test is that by the time of final sentence, by the time of the commencement of sentencing, he has to give, you know, a full and complete and truthful proffer. But he also has to act in good faith. And that was what Judge Blake said. Okay. That's really what this case gets down to. That's exactly what this case gets down to. What we've meant by the term. What? When we said in Shreffs. Shreffs? Shrestha. Shrestha. In reference to good faith and to Arrington. And how Arrington used the term good faith. Because that's where we got it from. That's right. And was there a question there? Well, so my. So what is your understanding of how this Court has used the term good faith in this context? Well, I think we have to let the trial judge have the first crack at it. And let him go through all the facts. Do whatever fact finding he feels or she feels that they need to do to get a good handle on that. And that's, I think, exactly what Judge Layton did. And we have to give him a certain amount of discretion in doing that. And he made the call that he made. And I think he made the right one. Correct me if I'm wrong. In Arrington, if you read Arrington carefully, in Arrington, the district, the court there, the Seventh Circuit there, used good faith in the sense that the defendant did not fully, when he didn't cooperate, it was that he didn't disclose, he didn't answer the government's additional questions. In other words, the government had additional knowledge, knew the circumstances of the crime, the defendant's role in the crime. And the government well knew that the defendant was not being honest in his disclosure. So the court used the term good faith in cooperating with the government. In that sense, not in this overall grand scheme. Well, we don't have any cases that tell us what good faith really means, how expensive it is or how limited it is. We have a case from the Seventh Circuit that helps. I mean, the Second Circuit, Schreiber, that also helps us understand the term. Right. But we don't have a lot to work with. We're in a somewhat gray area as to what good faith means. And I think it's a case-by-case basis, and we have to let the trial judges try to sort it out as best they can on a case-by-case basis. That's what Judge Layton did here. Well, but the whole purpose of the safety valve satisfying the requirements of the safety valve, you know, is to, you know, get away from the mandatory minimum. And it's to give low-level defendants an opportunity to offer up what little they may have, regardless of the value, and let the government do with it what it can. Now, sometimes it will be some value, sometimes there won't. That doesn't really have any bearing. But in this particular case, there clearly was something of great value. It was purposely withheld. It was purposely hidden out of the bushel basket until such time as it became totally worth it. Well, let me ask you this. Why, you know, just because you get under the safety valve doesn't mean that you're not, you know, the district court won't or can't impose a sentence over the mandatory minimum under the guidelines. That's exactly what Judge Layton said. So why doesn't that all just factor into the district court's discretion? Well, it can. And I think Judge Layton recognized that, and I think he gave us some language in his decision that basically indicated to us, look, safety valve or not, this is where I'm going, this is the right sentence. And he said that. Well, in this particular case, the guideline range is over the mandatory minimum. That's right. But you could have a safety valve situation and a guideline range that's below the mandatory minimum. Yes, we could. But we didn't have that in this case. That's true. I mean, I recognize that here. But I'm concerned about future cases as well. Well, certainly. But I think, you know, obviously what we're focused on is what are the facts of this case, what's right in this case, what's justice in this case. Did Judge Layton make the right call? And what I submit to you is under the very unique set of circumstances and facts of this case, that he, in fact, did that. He looked at it very carefully, made a very sound decision, and I think made a good record as to what he was doing and why he did it. You mean he made a good call with respect to the good faith, or he made a good call with respect to the sentence that he imposed? I think he made the right call and a good call on the question of good faith. On the question of how much time reasonable minds can differ. I look at everything the defendant did in this case, and frankly, I think the 210-month sentence was the right sentence. But, you know, I live with what I get, and I don't complain about it. That's just the way it is. Now, you had a cross appeal as well. No, not a cross appeal, but you argued that the district court erred in its determination, I think, that it was not a role, the role issue. Well, the problem with the role issue was this. Judge Tanner heard the case. Judge Layton did not. The burden of proof. The burden of proof is upon the government for purposes of imposing the guideline points for leadership. The burden is on the government. And the problem that Judge Layton had with this case was, look, I've read the transcript, and he says so. He addresses this in two different places in the transcripts. So it's the latter point where he addresses this, and he basically explains, look, on the basis of a transcript alone, I have great difficulty ever getting to clear and convincing evidence, and therefore I'm not going there. Had he been the trial judge, I think we would have had a different result. Clearly with trial Judge Tanner, we did have a different result. He twice said, you're a leader, and here's why. The first time he didn't say why. The second time he said why. And that's just our tough luck, and I'm not complaining about it. That's just the way it turned out. I don't complain that Judge Layton said, look, on the basis of a transcript alone, I can't assess the credibility of the witness, so I'm not going there. But at the same time, he did say, I think you're a leader. He said that right in the transcript. But I'm not finding it by clear and convincing evidence. And unfortunately, I missed that one. If I had been on my toes, I would have jumped up and said, Your Honor, it's the defendant's burden under the safety valve test to prove that he's not a leader, and he's failed to bear that burden. You have to keep the safety valve separate from the guideline. That's right. The safety valve, he bears the burden by a preponderance at the end of that. That's right. Two different parties. And I missed that. Oh, well, we all did. That happens sometimes in the heat of battle. And we just didn't see that issue coming up that way. So when Judge Layton made the statement, he did it right past me. So that's life. I can live with that. I think I'm out of time. Okay. Thank you very much. I appreciate your argument. The matter is submitted.
judges: D.W. Nelson, Thompson, Paez